UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KATHLEEN F. HORN,<br><br>            Plaintiff,<br><br><br>       vs.<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES,<br><br>            Defendant. | 4:16-CV-04172-RAL<br>4:18-CV-04062-RAL<br><br><br>OPINION AND ORDER GRANTING<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT |

Plaintiff Kathleen Horn ("Horn") filed two lawsuits against her former employer, the United States Department of Health and Human Services ("HHS"), alleging that HHS violated Title VII of the Civil Rights Act of 1964 by engaging in racial discrimination through disparate treatment, hostile work environment, retaliation, and constructive discharge. 4:16-CV-4172-RAL, Doc. 1; 4:18-CV-4062-RAL, Doc. 1.[1] This Court on a Joint Motion consolidated the cases into the first filed case of 16-CV-4172-RAL. Doc. 10. HHS filed a motion for summary judgment on all claims, Doc. 31, which Horn opposed, Doc. 40. For the reasons explained below, this Court grants HHS's motion for summary judgment on all claims.

I.      **Facts Not Subject to Dispute**

Under Local Rule 56.1, HHS filed a Statement of Undisputed Material Facts, Doc. 32, accompanying its Motion for Summary Judgment. Doc. 31. Horn responded by filing Plaintiff's

---

[1] This Court uses "Doc." followed by a number to refer to the document number of pleadings filed in the Case Management/Electric Case Filing system in this case, 4:16-CV-4172-RAL.

1

Response to Defendant's Statement of Undisputed Facts, Doc. 41, and Plaintiff's Additional Statement of Material Facts, Doc. 42. Defendant replied by filing Defendant's Response to Plaintiff's Statement of Additional Material Facts. Doc. 49. This Court takes the facts in the light most favorable to Horn as the non-moving party and draws the facts primarily from the undisputed portion of Defendants' Statement of Undisputed Facts, Doc. 32; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, Doc. 41; and Plaintiff's Statement of Additional Material Facts, Doc. 42. The facts in this section are not subject to genuine dispute. This Opinion and Order also incorporates additional facts that Horn considers to be true, but which HHS contests, in discussing Horn's arguments.

Plaintiff Kathleen F. Horn, a registered nurse, is a white woman. Doc. 32 at ¶¶ 1–2. Horn worked for Indian Health Services ("IHS") at the Wagner Service Unit from 2005 to 2015. Doc. 32 at ¶ 2. IHS is an agency within HHS. In 2012 or 2013, Horn began working a second job at Yankton Medical Clinic and worked as a nurse there until 2015. Doc. 32. at ¶ 3. Prior to working at the Yankton Medical Clinic, Horn worked a second job outside the IHS system as a nurse for Sanford Mid-Dakota Hospital in Chamberlain, South Dakota, in 2011 and 2012. Doc. 42 at ¶ 1.

In March 2014, Roberta Ducheneaux-Sinclair, an enrolled member of the Lower Brule Sioux Tribe, became Assistant Director of Nursing at the IHS Wagner Service Unit. Doc. 32 at ¶¶ 4–5. Ducheneaux-Sinclair was Horn's first-line supervisor. Doc. 32 at ¶ 6. Susan Knudsen was the Director of Nursing at the IHS Wagner Service Unit. Doc. 32 at ¶ 7. Knudsen, who is Native American, was Horn's second-line supervisor. Doc. 32. at ¶¶ 7–8.

### A. The Outside Activity Request

Shortly after Ducheneaux-Sinclair began working at the Wagner Service Unit, Knudsen informed her that two nurses, Horn and Lisa Miller, had additional employment outside their

respective positions at IHS.  Doc. 32 at ¶ 11.  Horn worked part-time at the Yankton Medical

Clinic, while Miller worked for the Yankton Sioux Tribe on archaeology activities.  Doc. 32 at ¶

11.  Upon learning that Horn and Miller worked outside the IHS system, Ducheneaux-Sinclair

sought clarification on whether HHS had approved the outside work activities.  Doc. 32 at ¶¶ 12–

13; Doc. 41.  This led to an inquiry at the HHS Area Office as to whether Horn's outside activity

request had been approved.  Doc. 32 at ¶ 13.  Upon learning that there was no approval request on

file, Ducheneaux-Sinclair requested Horn complete an outside activity request as soon as possible

and cease any outside activity until it was approved.  Doc. 32 at ¶ 13.

Generally, IHS employees who seek outside employment must obtain approval in advance

from IHS.  Doc. 32 at ¶ 9.  The approval process has three levels.  Doc. 32 at ¶ 10.  Initially, an

employee submits an HHS-520 "Request for Approval of Outside Activity" form to their frontline

supervisor, who makes a recommendation to either approve or deny the request.  Doc. 32 at ¶ 10.

The request is then evaluated by the second-line supervisor.  Doc. 32 at ¶ 10.  The request next

goes to the Area Director for review and approval before going to IHS ethics staff.  Doc. 32 at ¶

10.  If the ethics staff at IHS headquarters approves the request, it is returned to the employee as

approved.  Doc. 32 at ¶ 10.  In 2011 and 2012, Horn had sought and obtained approval for her

previous outside work at Sanford Mid-Dakota Hospital from Michael Horned Eagle, CEO of the

Wagner Service Unit, and Ron Cornelius, Acting Area Director.  Doc. 42 at ¶¶ 2–3.  The record is

silent on whether these requests were approved or disapproved by the IHS Ethics Office.  Doc. 42

at ¶ 7.

At Ducheneaux-Sinclair's request, on March 14, 2014, Horn completed an HHS-520

request, seeking approval of her outside work at Yankton Medical Clinic.  Doc. 32 at ¶¶ 13–14.

In the section of the form labeled "Nature of Outside Activity," Horn explained that "I perform

duties as a Registered Nurse in the clinic and hospital setting[.]   I do surgical nursing[.]   My position at Yankton Medical Clinic is a continuation of care for our IHS pts as I do there [sic] referrals and schedule them for surgery." Doc. 32 at ¶ 14.   Susan Knudsen signed Horn's HHS-520 request, recommending approval on April 4, 2014.   Doc. 32 at ¶ 15.   On April 7, 2014, Michael Horned Eagle, the CEO of the Wagner Service Unit, signed Horn's HHS-520 request recommending Horn's outside activity request be approved.   Doc. 32 at ¶ 16.   On April 18, 2014, the Acting Area Director for the Great Plains Area IHS office, signed Horn's outside activity request recommending it for approval.   Doc. 42 at ¶ 12.

Bennett Tuchawena, a Human Resources Specialist with IHS, handled outside activity requests for the area including the Wagner Service Unit.   Doc. 32 at ¶ 23.   His responsibilities included providing forms to employees, reviewing them once they were signed, forwarding the requests to the IHS Ethics Office, and serving as a point of contact to coordinate with the employee if the Ethics Office had any follow-up questions.   Doc. 32 at ¶ 23.   As part of his review of outside activity requests, Tuchawena reviewed information to ensure that the particular outside entity "is not [currently] receiving grants or has not received grants, contracts, purchase orders, or anything to do financially from either [IHS] or [HHS] in general."   Doc. 42 at ¶ 10.   Once the Ethics Office approved or disapproved a request, Tuchawena would draft a letter for the IHS Area Director to sign indicating whether the request was approved or denied.   Doc. 32 at ¶ 23.

Tuchawena served as an intermediary between the IHS Ethics Office and Horn as they investigated her outside activity request.   Doc. 32 at ¶¶ 24–29.   When Tuchawena reviewed Horn's outside activities request, he did not find any financial conflicts with Yankton Medical Clinic except for prior purchase orders from 2009 to 2011.   Doc. 42 at ¶ 11.   After the Acting Area Director issued his preliminary approval of Horn's request, Tuchawena forwarded the request to

4

IHS Ethics Coordinator Donald G. Lobeda, Jr. at the IHS Ethics Office.  Doc. 42 at ¶¶ 12–13.  In August 2014, Tuchawena relayed to Horn the IHS Ethics Office's request for clarification regarding whether Horn would be referring IHS patients for treatment at Yankton Medical Clinic. Doc. 42 at ¶ 14.  Horn replied:

> In clarification of the referral question[,] I myself do not refer [patients].  Referrals are entered into RPMS by the referring physician[']s nurse as directed by the IHS provider's [sic]. I at times have contact with the patient at both facilities and this is just a continuation of care for the patient.

Doc. 42 at ¶ 14.  Lobeda expressed concern that Horn would be treating an IHS patient in her role as a nurse at the Wagner Service Unit, and then the patient would be referred to Yankton Medical Clinic, which would be reimbursed with IHS funds for providing care.  Doc. 42 at ¶ 15.

HHS attorney Kevin Rudolph then advised that Horn would need confirmation that Yankton Medical Clinic was not paying her from an HHS/IHS funding source.  Doc. 42 at ¶ 16. Lobeda suggested obtaining a letter from Yankton Medical Clinic verifying that Horn's salary would not be paid from any HHS/IHS source.  Doc. 42 at ¶ 16.  This suggestion was forwarded to Tuchawena on September 10, 2014.  Doc. 42 at ¶ 16.  On September 10, 2014, Yankton Medical Clinic faxed a letter to IHS stating:

> This letter serves as verification that Kathee [sic] F. Horn is paid by Yankton Medical Clinic, P.C., a private entity, for hours worked at Yankton Medical Clinic, P.C. No Yankton Medical Clinic, P.C., hours are paid with HHS/Indian Health Services funds.

Doc. 42 at ¶ 17.

Ultimately, Horn's outside activity request was denied on November 21, 2014.  Doc. 32 at ¶ 17.  In recommending the denial, Lobeda wrote:

> Ms. Horn is a clinical nurse at the Wagner Indian [H]ealth Center in the Great Plains Area.  She requests approval to work as a nurse at the Yankton Medical Clinic (YMC).  Ms. Horn wishes approval to work 16 hours a week at the outside activity in addition to her full time IHS nursing duties . . . .

> In Item 1 of page 2 on the HHS 520, Ms. Horn indicates that she will be involved in the continuation of care for IHS patients referred to YMC.
>
> IHS employees may not receive additional income from outside sources for performing official duties. Ms. Horn's treatment of an IHS patient at YMC may be a violation of 18 U.S.C. 209, Supplementation of Salary.
>
> The Area Ethics Contact for Great Plains attempted for several months to clarify Ms. Horn's comments, but was unable to obtain resolution on this issue[.] Until Ms. Horn and her potential employer address concerns about this issue, her request should be denied.

Doc. 32 at ¶ 17.[2] That same day, Deputy Director Robert G. McSwain reviewed and denied Horn's HHS-520 request. Doc. 32 at ¶ 17. Lobeda, who works in Rockville, Maryland, testified that he never met Horn nor knew her race and was only familiar with Horn's name via her HHS-520 request. Doc. 32 at ¶¶ 18-19. He also testified that he did not know Ducheneaux-Sinclair. Doc. 32 at ¶ 19.

Tuchawena testified that he believed Horn's work at Wagner Service Unit to be in conflict with her work at Yankton Medical Center.[3] Doc. 32 at ¶¶ 24-26. Specifically, Tuchawena testified that when questioned about her HHS-520, Horn stated that while she did not refer patients, she "at times [has] contact with the patient at both facilities and this is just a continuation of care for the patient." Doc. 32 at ¶ 26. On December 1, 2014, Tuchawena emailed Horn to advise her that her HHS-520 request had been denied. Doc. 32 at ¶ 28. Bennett also wrote that Horn "must cease any and all activity associated with the outside entity since your request has been disapproved."

---

[2] 18 U.S.C. § 209(a) provides: "Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States . . . [s]hall be subject to the penalties set forth in section 216 of this title."
[3] Tuchawena testified that Horn "worked at the Wagner Service Unit, and the patients that she would be taking care of were also referred to the Yankton Medical Center where that became a conflict of interest[.]" Doc. 32 at ¶ 25.

Doc. 32 at ¶ 28. Horn alleges that she attempted to complete a revised HHS-520 outside activity request. Doc. 42 at ¶¶ 21–22. However, both Horned Eagle and Knudsen refused to approve it. Doc. 42 at ¶ 22. Horn alleges that Knudsen said she would not sign it because Ducheneaux-Sinclair would be angry with her. Doc. 42 at ¶ 22. The revised request was never approved. Doc. 42 at ¶ 22.

Around the time when Ducheneaux-Sinclair requested Horn submit an HHS-520 request, she learned there was no approval on file for Lisa Miller's outside activity. [4] Doc. 32 at ¶ 31. Miller is Native American and an enrolled member of the Yankton Sioux Tribe. Doc. 32 at ¶ 37. When Ducheneaux-Sinclair informed Miller about the absence of an approval request, Miller established that her request had been submitted and was going through the approval process. Doc. 32 at ¶ 31. Miller's HHS-520 request sought approval to work for the Yankton Sioux Tribe as a Traditional Cultural Specialist. Doc. 32 at ¶ 32. Miller described her duties as assisting the "Tribal Historic Preservation Officer in taking photograph, surveying areas at construction sites of private companies." Doc. 32 at ¶ 32. Miller also testified in a deposition that her outside activity was related to surveying construction sites for "culturally significant sites," such as "old burial grounds," and "looking for artifacts." Doc. 32 at ¶ 34. Ultimately, Miller's HHS-520 request was approved. [5] Doc. 32 at ¶ 35.

---

[4] Another nurse at the Wagner Service Unit under the supervision of Ducheneaux-Sinclair, Tyler Cuka, also sought approval for an outside activity. Doc. 32 at ¶ 38. Cuka's request was to work in construction. Doc. 32 at ¶ 39. Cuka is white. Doc. 32 at ¶ 41. His request was returned to him as "no need to file" because it did not "fall under the Activities Requiring Approval as defined under 5 C.F.R. § 5501.106(d)." Doc. 32 at ¶ 40. No other nurse in the Wagner Service Unit besides Horn sought approval for outside employment in healthcare or the medical field. Doc. 32 at ¶ 42.
[5] In the comment's section of Miller's HHS-520, the ethics official background notes explained that "the conflict analysis is complete and there is no apparent conflict." Doc. 32 at ¶ 36.

Tuchawena also communicated with Lobeda about Miller's HHS-520 request.  Doc. 42 at ¶ 19.  On March 25, 2014, Tuchawena sent Lobeda an email that stated "I have reviewed both TAGGS and FPDS.  Both do show that the [T]ribe is currently and/or has prior agreements, contracts, grants, purchase orders, etc. from DHHS.  However, the Historic Preservation Office does not show any."  Doc. 42 at ¶ 19.

Horn generally worked at Yankton Medical Clinic on Thursdays.  Doc. 42 at ¶ 30.  Thus, she had requested Thursdays off from IHS, and her request was generally honored until her activity request was denied.  Doc. 32 at ¶¶ 59–62, Doc. 42 at ¶ 30.  After Horn's outside work request was denied. Ducheneaux-Sinclair requested that Vicki Thaler, the clinical nurse responsible for creating draft schedules, begin scheduling Horn on Thursdays.  Doc. 32 at ¶¶ 59–62; Doc.42 at ¶ 30.  Subsequently, Horn was scheduled on some Thursdays despite Thaler honoring other nurses' requests for specific time off.  Doc. 42 at ¶ 30.

### B.  The work environment at IHS's Wagner Service Unit

On June 29, 2014, Horn, along with several other nurses, [6] wrote to Director of Nursing Knudson regarding "bullying" in the workplace.  Doc. 32 at ¶ 43.  They expressed concerns regarding nurses Miller and Tammy LaRoche, explaining they felt "fear and intimidation" when working with them.  Doc. 32 at ¶ 44.  The group wrote, "The hostile work environment has become sufficiently serious enough that it interfered with and limits our ability to provide good team-oriented service to the patients we service."  Doc. 32 at ¶ 45.  The letter did not mention race or tribal affiliation as potential sources of the "hostile work environment."  Doc. 32 at ¶ 46.

---

[6] Those nurses were Jamie Rodriguez, Martha Geuther, Vicki Thaler, and Pam Carda.  Doc. 32. at ¶ 43.

On July 9, 2014, the same group of nurses wrote to Knudson concerning "bullying" in the workplace by Miller and LaRoche. Doc. 32 at ¶ 47. In the letter, the group referenced the "fear, anxiety and intimidation" they felt when working with Miller and LaRoche due to the "loud, snappy, short, unfriendly and unprofessional childlike behavior." Doc. 32 at ¶ 48. The letter also asserts that Miller would sleep through her shift. Doc. 32 at ¶ 49. The July 9, 2014, letter did not mention race or tribal affiliation as potential sources or causes of the behavior or work environment. Doc. 32 at ¶ 51.

On January 21, 2015, Horn filed a "Pre-Complaint Intake Form" alleging that she had suffered racial discrimination in regards to her duty hours, the terms and conditions of her employment, time and attendance, and non-sexual harassment. Doc. 32 at ¶ 52. In this letter, Horn alleged that she believed the denial of her outside activity request was also discriminatory. Doc. 32 at ¶ 52.

On the same day, nurses Pamela Carda, Vicki Thaler, Martha Geuther, and Jamie Rodriguez also initiated the EEO process by filing a "Pre-Complaint Intake Form" alleging that they had been discriminated against based on race or tribal affiliation. Doc. 32 at ¶ 53. Horn and the other nurses identified Bobbi Jo Peltier, Chief Union Steward in the IHS Great Plains Area Office, as their representative. Doc. 32 at ¶ 54. Horn received two notices regarding her right to file a formal discrimination complaint. Doc. 32 at ¶ 56. One notice was related to Horn's individual complaint. Doc. 32 at ¶ 56. The other request related to her class complaint which listed Horn as the spokesperson. Doc. 32 at ¶ 56. On May 7, 2015, Horn wrote to the HHS EEO office and said, "please accept this as notification to go formal with the EEO." Doc. 32 at ¶ 57. Horn did not indicate whether she was referring to the class complaint or to her individual

complaint. Doc. 32 at ¶ 57. Ultimately, the only complaint that proceeded was Horn's individual complaint. Doc. 32 at ¶ 58.

Horn maintains that after filing her complaint, she and the other three nurses were confronted by Ducheneaux-Sinclair. Doc. 32 at ¶ 55. She recounts that Ducheneaux-Sinclair called them into a patient room and "demanded to know who was reporting to upper management and made it clear we were not to speak of being questioned." Doc. 32 at ¶ 55.

According to Horn, this event was the culmination of a deteriorating work environment at Wagner Service Unit that began when Ducheneaux-Sinclair was hired. Doc. 32 at ¶¶ 59–62; Doc. 42 at ¶¶ 31–38.[7] After Ducheneaux-Sinclair was hired, Horn believes that she was subjected to "different standards" than other employees at the Wagner Service Unit. Doc. 42 at ¶ 36. For example, she points out that Miller was allowed to sleep during her shift and was perpetually late. Doc. 42 at ¶¶ 37–39. However, Miller later was disciplined for time and attendance issues, eventually being put on a leave restriction. Doc. 32 at ¶¶ 66–69. Ducheneaux-Sinclair also formally disciplined Tammy LaRoche, a Native American nurse, for failing to renew her nursing license as required by the South Dakota Board of Nursing. Doc. 32 at ¶ 70. Horn was never disciplined despite reports that she was also late to work at times. Doc. 32 at ¶ 63. Additionally, Horn believes that performance reviews were conducted differently after Ducheneaux-Sinclair was hired. Doc. 42 at ¶ 35.[8] Horn testified that when Ducheneaux-Sinclair learned of her outside

---

[7] Some facts asserted by Horn in these paragraphs are disputed by IHS.

[8] Horn's testimony in part undermines this allegation. When asked if she had any issues with the performance evaluations she received at IHS, Horn responded: : "No. I will say it was kind of after [Ducheneaux-Sinclair] had come, the first one that she did, I think she was trying to do something different . . . . Like your proficiency with using the equipment is what she was doing and so she had me do it first. And then, you know, I had a good evaluation then too, but she would also try to use what I had told her to test the next people." Doc. 42 at ¶ 35.

employment at Yankton Medical Clinic, Ducheneaux-Sinclair responded, "Well, we're going to see about that," and "I'm going to get ahold of Bennett." Doc. 32 at ¶ 74.

Horn described the working conditions at Wagner Service Unit as stressful where nurses— specifically LaRoche and Miller—were uncooperative and sometimes made hurtful comments. Doc. 32 at ¶ 72. Horn testified that LaRoche and Miller made comments to Horn about her other job, stating "you were needed here." Doc. 32 at ¶ 73. Horn asserts that LaRoche and Miller would not help with screening patients, would throw papers at the nursing station, and make mocking and "just mean" comments about the size of another nurse's ears. Doc. 32 at ¶ 75. Horn testifies that LaRoche, while looking at Horn, said, "You know, I only pick up Native Americans that are hitchhiking, I don't pick up white people." Doc. 32 at ¶ 76. Horn also testified that LaRoche slammed doors and stated she was going to slash someone's tires. Doc. 32 at ¶ 77. According to Horn, this work environment became progressively worse. Doc. 32 at ¶ 78. Between the work environment at the Wagner Service Unit and denial of her outside activity request, Horn felt that her working conditions became intolerable. Doc. 32 at ¶ 78.

In May 2015, Horn—citing health concerns due to stress—pursued FMLA leave. Doc. 32 at ¶ 88. She then was on annual leave until her resignation. Doc. 32 at ¶ 88. Meanwhile, she continued to work for Yankton Medical Clinic. Doc. 32 at ¶ 89. On July 6, 2015, Horn resigned from Wagner Service Unit sending a letter entitled "Constructive Discharge Notice," citing her beliefs about a hostile work environment and racial discrimination at Wagner Service Unit. Doc. 32 at ¶ 91.

On December 19, 2016, Horn filed a complaint in 16-CV-4172-RAL, and on June 4, 2018, she filed a second complaint in 18-CV-4062-RAL. After consolidation of cases on March 29,

2021, HHS filed a motion for summary judgment. Doc. 31. For the reasons explained below, this Court grants HHS summary judgment.

## II.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); see also Reasonover v. St. Louis Cnty., 447 F.3d 569, 578 (8th Cir. 2006) (quoting Mayer v. Nextel W. Corp., 318 F.3d 803, 809 (8th Cir. 2003))) ("Evidence, not contentions, avoids summary judgment."). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Cases alleging discrimination are subject to the same summary judgment standard as any other case. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

## III.    Discussion

Horn argues HHS violated Title VII of the Civil Rights Act of 1964 by engaging in racial discrimination through disparate treatment, hostile work environment, retaliation, and constructive discharge. Doc. 40 at 1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended prohibits employment discrimination based on race, color, religion, sex, or national origin. As such, it is unlawful to discriminate against any "individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1)-(2).

Thus, "it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973), holding modified by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). Congress requires the "removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." Id. (citing Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)).

### A.  Disparate Treatment – Outside Activity Request

Horn's first claim of discrimination involves disparate treatment via the denial of her outside work activity request. Doc. 1 at ¶ 27. Disparate-treatment cases "occur where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985–986 (1988)). Therefore, "[a] disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." Id. (quoting Watson, 487 U.S. at 986).

Horn can establish her Title VII race-based discrimination claims through direct evidence, or in the absence of direct evidence, through the <u>McDonnell Douglas</u> burden-shifting framework. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. Horn presents no direct evidence of racial discrimination in the denial of her outside work activity request, but makes arguments using the <u>McDonnell Douglas</u> framework. Doc. 40 at 19–20. To survive a defendant's motion for summary judgment, the <u>McDonnell Douglas</u> framework requires that a plaintiff establish a prima facie case of discrimination. <u>Macklin v. FMC Transp., Inc.</u>, 815 F.3d 425, 427 (8th Cir. 2016). If the plaintiff is successful in establishing a prima facie case of discrimination, the burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse action of which the plaintiff complains. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506–07 (1993). If the defendant is able to do so, the burden shifts back to the plaintiff to establish the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Tx. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)); <u>Rodgers v. U.S. Bank, N.A.</u>, 417 F.3d 845, 850 (8th Cir. 2005) (quoting <u>Pope v. ESA Services, Inc.</u>, 406 F.3d 1001, 1007 (8th Cir. 2005)) ("If the employer meets its burden, 'the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination.'"), <u>abrogated on other grounds by Torgerson v. City of Rochester</u>, 643 F.3d 1031 (8th Cir. 2011). Despite the burden-shifting nature of the <u>McDonnell Douglas</u> framework, the ultimate burden of proving unlawful discrimination remains with the plaintiff. <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507.

Establishing a prima facie case of race discrimination requires that the plaintiff demonstrate that she: "(1) is a member of a protected class; (2) was meeting her employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than

similarly situated employees who were not members of her protected class." Jackman v. Fifth Jud.

Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013) (citing Norman v. Union Pac. R.R.

Co., 606 F.3d 455, 461 (8th Cir. 2010)); see also Macklin, 815 F.3d at 427 (citation omitted) ("To

establish a prima facie case for race discrimination, a plaintiff must show (1) he is a member of a

protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse

employment action, and (4) the circumstances give rise to an inference of discrimination (for

example, similarly situated employees outside the protected class were treated differently.").

Because Horn is white alleging reverse discrimination, she must also show IHS to be "the unusual

employer who discriminates against the majority." McGinnis v. Union Pac. R.R., 496 F.3d 868,

875 (8th Cir. 2007).

　　　The Eighth Circuit has "recognize[d] that the threshold of proof necessary to make a prima

facie case is minimal." Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109–10 (8th Cir.

1998). HHS assumes for purpose of summary judgment analysis that Horn could meet the first

three elements to establish a prima facie case of race discrimination. Doc. 35 at 23. However,

HHS contests that Horn has submitted enough evidence to establish the fourth element—that she

was treated differently than similarly situated employees who were not members of her protected

class. Doc. 35 at 23. "While '[t]he burden of establishing a prima facie case of disparate treatment

is not onerous,' the plaintiff must be able to produce some evidence of similarity between her and

her comparator." Rebouche v. Deere & Co., 786 F.3d 1083, 1087–88 (8th Cir. 2015) (quoting

Torgerson, 643 F.3d at 1047).

　　　Horn and HHS disagree as to the standard required to establish a comparator when

evaluating the fourth element of a prima facie case of discrimination. Doc. 35 at 23–25; Doc. 40

at 20–23. HHS, Doc. 47 at 3, contends "[t]he individual used as comparators must have dealt with

the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances," citing Gilmore v. AT & T, 319 F.3d 1042, 1046 (8th Cir. 2003) (quoting Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)).  Horn asserts, Doc. 40 at 21, that HHS has conflated the "rigorous" standard of proof necessary to establish whether the proffered justification from the defendant is a pretext during the final stage of the McDonnell Douglas framework with the relatively low standard necessary to establish the fourth element of a prima facie case of disparate race discrimination, citing Evance v. Truman Health Services, LLC, 719 F.3d 673, 678 (8th Cir. 2013) (cleaned up and citations omitted) ("To establish that this reason was a pretext for unlawful discrimination, [plaintiff] must pass the rigorous test to show that she and more favorably treated employees were similarly situated in all relevant respects.").  Horn argues that all she must show is that she and another employee engaged in the same or similar conduct but were treated differently.  Doc. 40 at 22; see also Wimbley v. Cashion, 588 F.3d 959, 962 (8th Cir. 2009).  "Although evidence of pretext is normally considered at the last step of the McDonnell Douglas analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case."  Young v. Builders Steel Co., 754 F.3d 573, 578 (8th Cir. 2014) (citing Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010)).

Recognizing a split in cases evaluating the fourth element of a prima facie case of race discrimination based on disparate treatment, but seeking to align with Supreme Court precedent more closely, the Eighth Circuit has adopted "the low-threshold standard at the prima facie stage." Rodgers, 417 F.3d at 852.  "The Supreme Court has advised: 'The burden of establishing a prima facie case of disparate treatment is not onerous.'"  Id. (quoting Burdine, 450 U.S. at 253). "Using a more rigorous standard at the prima facie stage would 'conflate the prima facie case with the

ultimate issue of discrimination,' thereby effectively eliminating the burden-shifting framework the Supreme Court has directed [courts] to use." Id.

Under the low threshold standard, Horn must show that she and Lisa Miller, a Native American nurse whose outside activity request was approved, were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." Id. (quoting Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004)). Horn satisfies this low burden when viewing the facts in the light most favorable to her. Horn and Miller were similarly situated because they both submitted outside activity requests while working as nurses at the Wagner Service Unit, yet only Miller's request was approved. HHS contends there are material differences that distinguish the two requests and the treatment of each; however, such differences are better analyzed when considering whether Horn and Miller were similarly situated for purposes of showing pretext in the last stage of the McDonnell Douglas framework—not when analyzing the fourth element of prima facie race discrimination cases. See id. Accordingly, Horn has met her burden of establishing a prima facie case of discrimination by disparate treatment based on the denial of her outside work activity when a similarly situated comparator of a different race received different treatment on such a request. Under the McDonnell Douglas framework, the burden shifts to HHS to demonstrate a legitimate, nondiscriminatory reason for the adverse action. St. Mary's Honor Ctr., 509 U.S. at 506–07.

HHS asserts that Horn's request was denied "because the treatment of IHS patients in Horn's continued care at the Yankton Medical Clinic was found to be a potential violation of 18 U.S.C. § 209, which prohibits IHS employees from receiving additional income from outside sources for performing official duties." Doc. 35 at 26. Horn concedes that HHS has met its burden under the McDonnell Douglas framework. Doc. 40 at 23. Therefore, the burden shifts back to

Horn to demonstrate that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).

To establish that HHS's stated reason for denial was a pretext for unlawful discrimination, Horn must pass a "'rigorous' test to show that she and more favorably treated employees were 'similarly situated in all relevant respects.'" Evance, 719 F.3d at 678 (quoting Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 956 (8th Cir. 2012)). "To demonstrate that they are 'similarly situated,' [the plaintiff] 'need only establish that he or she was treated differently than other employees whose violations were of comparable seriousness.'" Burton v. Arkansas Sec'y of State, 737 F.3d 1219, 1231 (8th Cir. 2013) (quoting Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 488 (8th Cir. 1998)). "The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Evance, 719 F.3d at 678 (quoting Bone, 686 F.3d at 956); see also Wimbley, 588 F.3d at 963 (finding a reasonable jury could find differential treatment of two officers accused of pepper spraying inmates is evidence that the stated reasons for one of their terminations was pretextual).

While the plaintiff is not required to produce "evidence of a clone," a more burdensome standard is required than what is necessary to establish the fourth element of a prima facie case of racial discrimination. Burton, 737 F.3d at 1230–31 (8th Cir. 2013) (citing Ridout v. JBS USA, LLC, 716 F.3d 1079, 1085 (8th Cir.2013)). "More substantial evidence of discrimination is required to prove pretext at this stage, as compared to the minimal showing required to establish a prima facie case, 'because evidence of pretext is viewed in the light of [the employer's] legitimate, nondiscriminatory explanation.'" Griffith v. City of Watertown, No. 1:15-CV-01020-RAL, 2016

18

WL 4275635, at *8 (D.S.D. Aug. 12, 2016) (quoting Jones v. UPS, Inc., 461 F.3d 982, 992 (8th Cir. 2006)).

"A plaintiff generally may show that a proffered justification is pretextual in two ways." Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014) (citing Fitzgerald v. Action, Inc., 521 F.3d 867, 873 (8th Cir. 2008). "First, a plaintiff may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that the explanation is unworthy of credence." Id. (citing Fitzgerald, 521 F.3d at 873). "Second, a plaintiff may show that the employer's proffered explanation was not the true reason for the action, but rather that the impermissible motive more likely motivated the employer's action." Id. (citing Fitzgerald, 521 F.3d at 873). "In either case, the plaintiff 'must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" Id. (citing Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 371 (8th Cir. 2014)). Thus, "[t]o succeed at this stage of the McDonnell Douglas analysis, plaintiffs must prove that the prohibited reason was a determinative factor in [defendant's] decision to terminate." Jones v. United Parcel Serv., Inc., 461 F.3d 982, 992 (8th Cir. 2006) (citing Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001)); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

"The Eighth Circuit has stressed that federal courts are not to act as 'super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'" Griffith, No. 1:15-CV-01020-RAL at *8 (quoting Cronquist, 237 F.3d at 928). "[E]mployers are free to make

employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." Hervey v. Cnty. of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008) (quoting Edmund v. MidAmerican Energy Co., 299 F.3d 679, 685–86 (8th Cir. 2002)).

HHS points to an absence of pretext because Miller's outside work activity request was distinct from Horn's in that Miller's request did not implicate a potential violation of 18 U.S.C. § 209. Doc. 35 at 26. Indeed, Miller sought permission to work in a field unrelated to healthcare, as a Traditional Cultural Specialist for the Tribal Historic Preservation Office. Doc. 32 at ¶ 32. Horn by contrast sought to work in another healthcare setting, as a nurse at the Yankton Medical Clinic. Doc. 32 at ¶ 14. According to HHS, Horn's request was denied because "IHS employees may not receive additional income from outside sources for performing official duties. Ms. Horn's treatment of an IHS patient at YMC may be a violation of 18 U.S.C. 209, Supplementation of Salary." Doc. 32 at ¶ 17, Doc 47 at 9. Because Horn's request asked to be allowed to work at Yankton Medical Clinic where she would treat some of the same patients whom she had treated at IHS, her request potentially implicated 18 U.S.C. § 209, where Miller's request to work in archaeological activities did not. The two outside work activity requests are dissimilar, and thus Horn cannot pass the "rigorous" test to show she was treated less favorably than a similarly situated employee. See Evance, 719 F.3d at 678.

Furthermore, Horn cannot point to any evidence that racial animosity was the underlying reason to reject her outside work activity request. In fact, the official ultimately responsible for approving or disapproving Horn's outside activity request—Donald G. Lobeda, Jr.— worked in Rockville, Maryland, a different location than Horn, and testified that he never met Horn, nor knew of her race. Doc. 32 at ¶¶ 18–19; Doc. 47 at 4. Horn cannot show pretext for reverse race

discrimination when the HHS decisionmaker did not know Horn was white.[9]   See Walker v.
Dalton, 94 F. Supp. 2d 8, 15–16 (D.D.C. 2000) (rejecting pretext where the decisionmaker did not
know race of selectees); see also Owens v. Donahoe, 913 F. Supp. 2d 1055, 1062 (D. Colo. 2012)
("[I]f the decisionmaker is not aware of a person's race, a plaintiff cannot establish a prima facie
because it is impossible to infer that the decision was due to discriminatory intent."); E.E.O.C. v.
BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484 (10th Cir. 2006) ("[I]t is
undisputed that Ms. Edgar, who formally made the termination decision, worked in a different city
and had no idea that [the plaintiff] is black.   She therefore could not have acted for racially
discriminatory reasons.").   Horn has failed to establish the justification proffered by IHS is a
pretext for racial discrimination.

### B.   Disparate Treatment – Scheduling, Performance Reviews, Disciplinary Standards, Class Complaint, and Cumulative Harassment

Horn next alleges disparate treatment based on race related to a variety of practices—
scheduling, inconsistent performance reviews, differing disciplinary standards, IHS's treatment of
her complaint as a class complaint rather than individual, and the cumulative nature of such
conduct.[10]   HHS counters that Horn did not suffer any adverse employment actions.   Doc. 35 at
31–36.   The Court addresses each claim individually under the McDonnell Douglas framework.
Jackman, 728 F.3d at 804 (citing Norman, 606 F.3d at 461) (A prima facie case of race
discrimination requires the plaintiff demonstrate she: "(1) is a member of a protected class; (2) was

---

[9] The local IHS supervisors who would have known that Horn was white recommended approval
of her outside work activity request.   Doc. 32 at ¶¶ 15-16.

[10] See Doc. 40 at 31 (citations omitted) ("Horn was subjected to schedule changes and
Ducheneaux-Sinclair's acquiescence of unacceptable behavior by Native American nurses; such
as sleeping on the job, chronic lateness, leaving early without authorization, ridicule and rudeness
by coworkers, racist remarks, refusing to assist Horn, differences in performance evaluations, and
delaying her complaint.").

meeting her employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of her protected class.").

### 1. Scheduling Changes

Because HHS's stated reasoning for denying Horn's activity request was not a pretext for racial discrimination, neither was enforcing that decision. At any rate, as discussed, the scheduling change about which Horn complained did not result in the type of adverse employment action that is necessary to sustain the third element of a prima facie race discrimination claim. "An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." Jones v. City of St. Louis, Missouri, 825 F.3d 476, 480 (8th Cir. 2016) (quoting Jackman, 728 F.3d at 804–05). "Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action." Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005) (quoting Cruzan v. Special Sch. Dist. # 1, 294 F.3d 981, 984 (8th Cir. 2002)). "In other words, '[c]hanges in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case." Hughes v. Stottlemyre, 454 F.3d 791, 797 (8th Cir. 2006) (quoting Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).

Consequently, scheduling changes typically do not rise to an adverse employment action because they do not decrease title, salary, or benefits, or result in a material disadvantage. The Eighth Circuit has previously declined to find adverse employment actions when employees were scheduled to work a non-preferred schedule. See id, at 797 (rejecting that requiring an employee

to work on non-preferred days was an adverse employment action); see also Recio v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008) (quoting Clegg v. Arkansas Dep't of Correction, 496 F.3d 922, 929 (8th Cir. 2007) ("The mere fact that [defendant] disallowed [plaintiff] from maintaining her preferred teaching schedule, without any indication that [plaintiff] suffered a material disadvantage as a result of the action, does not 'meet the significant harm standard set forth in Burlington Northern.'"); but see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006) (stating that context is important and therefore "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children").

Although it was Horn's preference that she remained unscheduled on Thursdays, "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." Jackman, 728 F.3d at 804 (citing Wilkie v. Dep't of Health and Human Servs., 638 F.3d 944, 955 (8th Cir. 2011)). Indeed, the only material disadvantage to the scheduling change that Horn could point to is her inability to work on Thursdays at Yankton Medical Clinic. Even if IHS scheduled Horn on Thursdays to prevent her from working at Yankton Medical Clinic, Horn would still need to prove the pretext element—i.e., that the decision was based on racial animus and not to properly enforce the denial of Horn's outside work activity request. HHS is entitled to summary judgment on this claim.

### 2. Performance Reviews

Horn also asserts that differences in performance reviews resulted in disparate treatment; however, she fails to show that those differences resulted in adverse action. Doc. 40 at 33–34. Horn claims that Ducheneaux-Sinclair would watch Horn use equipment during her performance

review and subsequently advise other nurses on procedures to inflate their scores to the detriment of Horn. Doc. 42 at ¶ 35. Although Horn acknowledges her reviews were "positive," she claims "[a]ny promotion or bonus opportunity would be further skewed by other nurses' evaluations being more positive than the reality." Doc. 40 at 34. This allegation does not sufficiently establish that Horn suffered an adverse employment action. See Spears v. Missouri Dep't of Corr. & Hum. Res., 210 F.3d 850, 854 (8th Cir. 2000) (cleaned up and citations omitted) (holding plaintiff's "successful performance evaluation was not an adverse employment action" because loss of prestige is not enough to establish actionable adverse action). Indeed, under Eighth Circuit precedent, even "[a] poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment." Id. (citing Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999)). Because Horn does not establish that she experienced any adverse action as a result of the performance reviews, HHS is entitled to summary judgment on this claim.

### 3. Disciplinary Standards

Next Horn contends that uneven disciplinary standards resulted in disparate treatment using the same allegations underlying her hostile work environment claim such as her poor treatment by supervisor Ducheneaux-Sinclair and by fellow nurses Miller and LaRoche. Doc. 40 at 32–33. "A plaintiff can often avoid summary judgment with evidence showing instances of dissimilar discipline." Wilson v. Arkansas Dep't of Hum. Servs., 850 F.3d 368, 371 (8th Cir. 2017) (citing Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)). However, the plaintiff must have actually suffered disparate treatment. See id. (cleaned up and citation omitted) ("[Plaintiff's] claim of discipline for something that a Caucasian female employee did not accomplish does not

allege that the Caucasian employee was not disciplined or received less discipline. Without an allegation of disparate treatment, this claim fails.").

Horn admits that she was not subject to discipline at IHS. Doc. 32 at ¶ 63. Because Horn was not disciplined, she suffered no adverse employment actions and thus has no claim based on what she perceived as uneven discipline. HHS is entitled to summary judgment on this claim.

### 4. Characterizing Horn's Claim as Part of a Class

Next Horn argues that HHS's treatment of her complaint as a class rather than individual complaint is disparate treatment. Doc. 40 at 34. This followed Horn joining with other IHS employees in a letter complaining of bullying by two co-employees. Doc. 32 at ¶ 43. Horn cannot identify what adverse employment action she suffered from this treatment or what similarly situated employees she claims to use as comparators to meet either the third or fourth element of the prima facie test for discrimination. Horn's response to summary judgment on this claim was:

> At the very least, there is a question of fact as to whether this was an attempt by the Agency to cloud the issues by combining her complaint with the other nurses complaints, as two other complaints were based on tribal affiliation, not race. A group complaint alleging racial discrimination is far less likely to succeed when there are two individuals in the group who are Native American.

Doc. 40 at 34. Horn's argument is speculative at best. She offers no evidence that her complaint was classified a certain way to further discriminate against her or that she suffered adverse action from such a classification. Therefore, summary judgment is proper. Evance, 719 F.3d at 677 (citing Beaulieu v. Ludeman, 690 F.3d 1017, 1024 (8th Cir. 2012)) ("[S]peculation and conjecture are insufficient to defeat summary judgment[.]").

### 5. Cumulative Harassment

Finally, Horn asks the Court to evaluate all the above cumulatively as the conduct taken together is "significantly more disruptive than a mere inconvenience." Doc. 40 at 30 (citing

Phillips v. Collings, 256 F.3d 843 (8th Cir. 2001) and Kim v. Nash Finch Co., 123 F.3d 1046 (8th Cir. 1997)).   The facts in this case, however, are far less egregious than the cases Horn cites to support her contention that cumulative harassment resulted in disparate treatment.   For instance, in Phillip v. Collings, the Eighth Circuit found an adverse employment action where defendant initially recommended plaintiff for discharge and then proceeded to write a 53-page evaluation "critiquing every aspect of [plaintiff's] performance." 256 F.3d at 848.   In Kim v. Nash Finch, the Eighth Circuit found an adverse employment action due to a reduction in duties, disciplinary action, negative personnel reports, and employer-required remedial training.   123 F.3d at 1060. Nothing nearly as extreme occurred in Horn's work environment.   Horn was never disciplined, never received a negative performance review, and was never at risk of discharge.   Therefore, she experienced no adverse employment action within the purview of Title VII.   Even when evaluating the record in the light most favorable to Horn, the facts do not establish a prima facie case of disparate racial treatment.

## C. Hostile Work Environment

Horn's next claim alleges that she suffered from a hostile work environment at Wagner Service Unit in violation of Title VII.   Doc. 40 at 35.   Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted).   To establish a hostile work environment claim, Horn must prove that "(1) she is a member of a protected group; (2) she was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." Clay v. Credit Bureau Enters., Inc., 754 F.3d 535, 540 (8th Cir. 2014) (cleaned

26

up) (quoting <u>Malone v. Ameren UE</u>, 646 F.3d 512, 517 (8th Cir. 2011)).  HHS can be liable for harassment by Horn's non-supervisory coworkers only if it "knew or should have known of the harassment and failed to take proper remedial action." <u>Tatum v. City of Berkeley</u>, 408 F.3d 543, 550 (8th Cir. 2005).

In order to establish the fourth element, Horn must show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Clay</u>, 754 F.3d at 540 (quoting <u>Malone</u>, 646 F.3d at 517).  This requires a finding that the environment was both one that "a reasonable person would find hostile and one that the victim actually perceived as abusive." <u>Duncan v. Gen. Motors Corp.</u>, 300 F.3d 928, 934 (8th Cir. 2002).  In determining whether a workplace is objectively hostile, courts must consider "all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." <u>Singletary v. Mo. Dep't of Corr.</u>, 423 F.3d 886, 892–93 (8th Cir. 2005).  "[N]o single factor is required," and it "is not, and by its nature cannot be, a mathematically precise test." <u>Harris</u>, 510 U.S. at 22–23.

From the undisputed facts discussed previously, Horn alleges that one racially charged comment was made by coworker LaRoche, specifically, "I only pick up Native American hitchhikers, not white people." Doc. 32 at ¶ 76.  Horn also contends that two co-workers—Miller and LaRoche—targeted "anyone who was either white or had a different tribal affiliation." Doc. 40 at 36.  She offers as evidence the letters and claims made by her fellow coworkers in their EEO complaint. Doc. 40 at 35–36.  Even when viewed in the light most favorable to Horn, the evidence offered falls short of the high bar set by the Supreme Court and Eighth Circuit to establish this sort of claim.  "A hostile work environment exists when the workplace is dominated by racial slurs,

27

but not when the offensive conduct consists of offhand comments and isolated incidents." Clay,

754 F.3d at 540 (quoting Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759 (8th Cir. 2004)).

Additionally, "simple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of employment."

Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (cleaned up and citations omitted). "To

be actionable, such conduct must be shown to occur with such frequency that the very conditions

of employment are altered and be viewed by a reasonable person as hostile." Singletary, 423 F.3d

at 893.

Previous decisions demonstrate that Horn has not met the high bar set by the Eighth Circuit.

See, e.g., Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1085–87 (8th Cir. 2010) (holding

insensitive comments about racial stereotypes were of insufficient frequency and severity to

constitute a hostile work environment), abrogated on other grounds by Torgerson, 643 F.3d 1031;

Bainbridge, 378 F.3d at 759–60 (finding a hostile work environment claim could not be sustained

where the plaintiff, whose wife was Japanese, alleged his supervisors made racially offensive

remarks about Asians at least once a month for two years); Woodland v. Joseph T. Ryerson & Son,

Inc., 302 F.3d 839, 843–44 (8th Cir. 2002) (finding that three instances where the plaintiff heard

from a third party that racial epithets had been used to describe him and two instances where the

plaintiff overheard coworkers use racial epithets to describe other African American employees,

in addition to other "sporadic racially-motivated misconduct," could not sustain a hostile work

environment claim). Horn's allegation surrounding only one racially insensitive comment is not

the kind of frequent or severe conduct that would alter the conditions of employment. Horn's

reliance on the assertions that she and others made in the EEO complaints likewise is insufficient

to establish a work environment so racially hostile as to alter the conditions of her employment.

The Eighth Circuit's decision in <u>Bradley v. Widnall</u>, 232 F.3d 626 (8th Cir. 2000), <u>abrogated on other grounds by</u> <u>Torgerson</u>, 643 F.3d 1031, is illustrative of why Horn's hostile work environment claim does not survive summary judgment. In <u>Bradley</u>, the plaintiff alleged she had been subjected to a hostile work environment when her supervisor "made various negative comments in her regard, removed much of her decision-making authority, encouraged her employees to bypass the chain of command, gave white employees preferential treatment, instructed employees to spy on her activities, had disparaging memos placed in her file, attempted to 'set her up' to fail a hospital inspection, and generally treated her in a disrespectful and discriminatory manner." <u>Id.</u> at 630. The Eighth Circuit affirmed the district court's grant of summary judgment, holding that while the "conduct cited by [plaintiff] may have resulted in a frustrating work situation," it was not "so severe or pervasive as to have affected a term, condition, or privilege of employment." <u>Id.</u> at 631–32. Like the plaintiff in <u>Bradley</u>, Horn's allegations constitute at most a "frustrating work situation" and not harassment that affected a term or condition of her employment. Accordingly, HHS is entitled to summary judgment on Horn's hostile work environment claim.

**D. Retaliation**

Horn alleges that she was retaliated against in violation of Title VII. Doc. 40 at 37–38. "Title VII prohibits an employer from discriminating against an employee who 'has opposed any practice made an unlawful employment practice by this subchapter' or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" <u>Barker v. Missouri Dep't of Corr.</u>, 513 F.3d 831, 834 (8th Cir. 2008) (quoting

42 U.S.C. § 2000e-3(a)).[11]  Horn may avoid summary judgment on her retaliation claim by either offering direct evidence of retaliation or using the McDonnell Douglas framework to create an inference of retaliation.  Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739 (8th Cir. 2017).  Horn does not argue that she has direct evidence of retaliation, but rather presents her claim under the McDonnell Douglas framework.  Doc. 40 at 37–38.  Under that framework, Horn has the initial burden of establishing a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity.  Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011).  If Horn establishes a prima facie case, the burden of production shifts to HHS to proffer "a legitimate, non-retaliatory reason for its action."  Id. (quoting Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1078 (8th Cir. 2010)).  If HHS meets this burden, Horn must offer evidence that the proffered reason is pretext for discrimination.  Id.  Horn at all times retains the ultimate burden of proving that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action.  Donathan, 861 F.3d at 739–40 (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).

Horn asserts that she suffered retaliatory actions when her supervisor, Ducheneaux-Sinclair, met with Horn and three other nurses and "demanded to know who was reporting to upper management and made it clear we were not to speak of being questioned."  Doc. 32 at ¶ 55.  Horn also contends Ducheneaux-Sinclair's hostility toward her was retaliatory.  Doc. 40 at 37–38; Doc. 42 at ¶¶ 22, 31.  HHS asserts that Horn did not suffer an "adverse employment action" from this

---

[11] "The two clauses of this section typically are described, respectively, as the opposition clause and the participation clause."  Barker, 513 F.3d at 834 (Colloton, J., concurring) (quoting Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 741 (8th Cir. 2005)).

conduct, and thus fails to establish the second element of a prima facie case for retaliatory discrimination. Doc. 35 at 41.

According to the Supreme Court of the United States, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Although Horn's interaction with Ducheneaux-Sinclair may very well have had a chilling effect, it falls short of the type of conduct that would be considered an "adverse employment action" and dissuade a reasonable worker from making or supporting a charge of discrimination. Doc. 40 at 38. The Supreme Court "speak[s] of *material* adversity because [it] believe[s] it is important to separate significant from trivial harms." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68. Title VII is not a "general civility code for the American workplace." Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

The Eighth Circuit has "held that 'termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet [the adverse employment action standard].'" Brannum v. Missouri Dep't of Corr., 518 F.3d 542, 549 (8th Cir. 2008) (cleaned up) (quoting Spears, 210 F.3d at 853). The Eighth Circuit has "also reiterated, however, that 'minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.'" Id. (quoting Spears, 210 F.3d at 853).

Horn's claim is similar to ones where the Eighth Circuit has found no viable retaliation claim under Title VII. See, e.g., Brannum, 518 F.3d at 549 (concluding that the plaintiff could not

31

have had a reasonable belief that she was suffering disparate treatment under Title VII because "there [was] no evidence from which a reasonable person could conclude" that an adverse employment action had occurred); Higgins v. Gonzales, 481 F.3d 578, 591 (8th Cir. 2007), (rejecting a Title VII retaliation claim and stating that "personality conflicts, bad manners, or petty slights and snubs" did not "materially and adversely" affect life such that a reasonable employee would be dissuaded from complaining), abrogated on other grounds by Torgerson, 643 F.3d 1031; Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) (holding that employee could not have had an objectively reasonable belief that employer violated Title VII because the telephone message threatening the employee's job fell "well short" of an adverse employment action).

Although Ducheneaux-Sinclair's warning to Horn and the other nurses was inappropriate, it was isolated and did not lead to a termination, reduction in pay or benefits, or change in employment that significantly affected Horn's future career prospects.   In short, Ducheneaux-Sinclair's statement was not so materially adverse as to dissuade a reasonable worker from making or supporting a charge of discrimination.   In fact, Horn herself admits the class complaint was discontinued because the other nurses could not afford to pay for legal services, not because they were intimidated or felt threatened by supervisors.   Doc. 32 at ¶ 58. Therefore, Horn cannot establish the necessary elements of a Title VII retaliation claim, and this claim does not survive summary judgment.

### E.  Constructive Discharge

Horn concludes her complaint with an allegation of constructive discharge.   Doc. 40 at 38. "Title VII encompasses employer liability for a constructive discharge."  Pa. State Police v. Suders, 542 U.S. 129, 143 (2004).  Constructive discharge under Title VII can be a "compound claim" that joins with either harassment or hostile work environment.   Id. at 147.   But "[h]ostile work

environment and constructive discharge claims may be wholly distinct causes of action under Title VII" because, although "a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a tangible employment action." Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 607 (8th Cir. 2009) (cleaned up and citations omitted); see also Pa. State Police, 542 U.S. at 147 ("A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."); Wilkie, 638 F.3d at 954 (finding that because a plaintiff's hostile work environment claim failed and the plaintiff's constructive discharge claim was presented on the same evidence, it too failed); O'Brien v. Dep't of Agric., 532 F.3d 805, 811 (8th Cir. 2008) (same).

"To establish a case of constructive discharge, [Horn] must show that '(1) a reasonable person in [her] situation would find [her] working conditions intolerable, and (2) the employer intended to force [her] to quit.'" Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 186 (8th Cir. 2014) (quoting Rester v. Stephens Media, LLC, 739 F.3d 1127, 1132 (8th Cir. 2014)). The first element is measured by an objective standard, not the subjective feelings of a plaintiff. Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 932 (8th Cir. 2000). Evidence of the employer's intent may be proven "through direct evidence or through evidence that 'the employer . . . could have reasonably foreseen that the employee would [quit] as a result of its actions.'" Fercello, 612 F.3d at 1083 (quoting Wright v. Rolette Cnty., 417 F.3d 879, 886 (8th Cir. 2005)).

Horn cannot establish either element. Her constructive discharge claim is premised on the same allegations that are insufficient as a matter of law to establish her hostile work environment claim. As such, her claim fails on the first element of showing an intolerable work environment. See Smith, 625 F.3d at 1087 ("Because we have already concluded that [plaintiff] has not successfully shown that her hostile work environment claim should have survived summary

judgment, her constructive discharge claim also fails.").  Moreover, there is no evidence in the record from which a jury could find an intent by HHS to compel Horn's resignation.  Even if Horn's work environment was unpleasant, there is insufficient evidence as a matter of law that the work environment was intolerable or that HHS was motivated by a desire to force her to resign.  Consequently, HHS is entitled to summary judgment on the constructive discharge claim as well.

## IV. Conclusion

For the reasons explained above, it is hereby

ORDERED that the Defendant's Motion for Summary Judgment, Doc. 31, is granted.

DATED this ___28ᵗʰ___ day of September, 2021.

BY THE COURT:


_____
ROBERTO A. LANGE
CHIEF JUDGE

34